Nathan Graham, pro se.

---

CLEVELAND BAR ASSOCIATION *v.* RUS.

[Cite as *Cleveland Bar Assn. v. Rus,*
106 Ohio St.3d 467, 2005-Ohio-5520.]

(No. 2005–0752—Submitted June 28, 2005—Decided November 2, 2005.)

**Per Curiam.**

{¶ 1} Respondent, Vladimir Michael Rus, of Lakewood, Ohio, Attorney Registration No. 0023776, was admitted to the Ohio bar in 1981.

{¶ 2} On January 12, 2005, relator, Cleveland Bar Association, filed an amended complaint charging respondent with professional misconduct. A panel of the Board of Commissioners on Grievances and Discipline held a hearing and issued findings of fact, conclusions of law, and a recommended sanction, all of which the board adopted.

## Misconduct

{¶ 3} In 1997, the water pipes in the Cleveland home of Rose A. Huffman burst while she was asleep. When Huffman awoke and stepped out of bed, her feet landed in hot water.

{¶ 4} Huffman then hired respondent to represent her, and he filed a personal-injury lawsuit on her behalf in 1999. The case was removed to federal court, and respondent reached a settlement with the defendant's counsel in May 2001. In connection with that settlement, a "Full and Final Release" was purportedly signed by Huffman in June 2001. Respondent himself signed that release twice, both as a witness and as a notary for Huffman's signature, and then returned the signed release to the defendant's counsel. Consistent with the lawyers' settlement discussions, an $85,000 settlement check payable to "Rose Huffman & Vladimir M. Rus, her attorney" was sent to respondent, was purportedly endorsed by Huffman and respondent, and was deposited into respondent's trust account on June 21, 2001.

{¶ 5} Huffman, however, was unaware that her case had been settled, had not signed the release that bears her purported signature, and had not endorsed the settlement check that was payable to her. In fact, she first learned about the settlement two years later, when her aunt checked with the federal court and discovered that the case had been settled in May 2001. Huffman then made a number of telephone calls to respondent's office, and after some delay, respondent agreed to meet with her. When they met in 2003, respondent still did not tell Huffman that he had settled her case and did not pay her any of the proceeds from the settlement.

{¶ 6} Then, in October 2003, Huffman met with the attorney who had represented the defendant in her lawsuit, and he showed her the signed documents confirming that the case had in fact been settled in 2001. Armed with that proof, Huffman again called respondent and left a voicemail message telling him that she had met with the defendant's lawyer, had seen the settlement papers, and wanted her share of the settlement proceeds. Respondent returned the call and told Huffman that he would send her a check. In November 2003, Huffman received a $57,000 check drawn on respondent's trust account and made payable to Huffman; however, it was not signed by the respondent, and Huffman's bank refused to accept it. Finally, several days later, respondent sent a valid $57,000 check to Huffman.

{¶ 7} When questioned by relator, respondent offered little explanation for his conduct. He claimed that he could not recall the circumstances surrounding the signing of the settlement documents in 2001, but denied that he had signed Huffman's name to the release or the settlement check, both of which bear her purported signature. As for the delay between his receipt of the settlement

proceeds in June 2001 and his issuance of a check to Huffman for her share of those proceeds in November 2003, respondent said, "There certainly was that delay and I have no explanation for it."

{¶ 8} Respondent also testified that the settlement proceeds were in his trust account throughout the two-year period between his receipt of the settlement check from the defendant in 2001 and his payment to Huffman of her share in 2003. That was not true, however. During the 14-month period after he deposited the $85,000 check into his trust account in June 2001, respondent wrote several checks to "cash," to himself, and to credit-card companies. By July 2002, the balance in respondent's trust account had been reduced to $1,544.82, and there was no further activity in the account until November 2003, when respondent deposited enough funds into the account to cover the $57,000 check that he sent to Huffman that month. On the "memo" line on the face of the check that respondent wrote to replenish his trust account so that he could pay Huffman in November 2003, respondent typed the words "loan repayment."

{¶ 9} Relator's investigator and assistant counsel tried repeatedly to contact respondent when they began their investigation of Huffman's grievance. Respondent did not reply to their letters sent by certified and regular mail. Respondent did appear in response to relator's deposition subpoena, but he did not produce any of the bank records or client files that were requested in the subpoena and testified that he had simply thrown away any correspondence from relator without opening it.

{¶ 10} After his deposition in 2004, respondent sent Huffman an additional check in the amount of $28,000. That check together with the $57,000 check that respondent sent to Huffman in November 2003 represented the full $85,000 that the defendant had paid to settle Huffman's personal-injury suit in 2001.

{¶ 11} The board found that respondent had violated DR 1–102(A)(3) (barring illegal conduct involving moral turpitude), 1–102(A)(4) (barring conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (barring conduct prejudicial to the administration of justice), 1–102(A)(6) (barring conduct that adversely reflects on a lawyer's fitness to practice law), 9–102(B)(1) (requiring prompt notification that an attorney has received a client's funds), 9–102(B)(4) (requiring prompt payment of the client's funds or other property in the lawyer's possession), 9–102(A) (requiring lawyers to maintain client funds in a separate, identifiable bank account), and Gov.Bar R. V(4)(G) (requiring attorneys to cooperate with and assist in any disciplinary investigation).

## Sanction

{¶ 12} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and

Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). As aggravating factors, the board found that respondent had acted with a dishonest and selfish motive by twice forging his client's signature and by retaining client funds for his own use for more than two years. BCGD Proc.Reg. 10(B)(1)(b). The board also found that respondent had not cooperated in the disciplinary process, had been evasive and had given false statements during the disciplinary process, had refused to acknowledge the wrongfulness of his actions, and had caused harm to a vulnerable former client. BCGD Proc.Reg. 10(B)(1)(e), (f), (g), and (h).

{¶ 13} On the mitigating side of the equation, the board cited respondent's lack of any prior disciplinary record and his payment of full restitution to Huffman. BCGD Proc.Reg. 10(B)(2)(a).

{¶ 14} Relator recommended that respondent be permanently disbarred, but the panel and the board instead recommended that respondent's license to practice law be indefinitely suspended.

{¶ 15} We agree that respondent violated all of the provisions explained above, and we also agree that an indefinite suspension is appropriate. To be sure, we have disbarred some attorneys who—like respondent—misappropriated client funds. See, e.g., *Cleveland Bar Assn. v. Belock* (1998), 82 Ohio St.3d 98, 694 N.E.2d 897 (attorney misappropriated funds from three clients and was convicted on federal criminal charges); *Cuyahoga Cty. Bar Assn. v. Churilla* (1997), 78 Ohio St.3d 348, 350, 678 N.E.2d 515 (attorney engaged in a "continued pattern of stealing from clients"). In this case, however, the respondent has no prior disciplinary record, he has made complete restitution to the one client he harmed, and he has indicated that he no longer practices law and indeed would like to resign from the Ohio bar. He also has not been charged with or convicted of any criminal offenses. In similar cases, we have imposed an indefinite suspension. See, e.g., *Disciplinary Counsel v. Nagorny*, 105 Ohio St.3d 97, 2004-Ohio-6899, 822 N.E.2d 1233, ¶ 15 (noting several mitigating factors, including the attorney's payment of restitution); *Columbus Bar Assn. v. Hamilton* (2000), 88 Ohio St.3d 330, 332, 725 N.E.2d 1116 (mitigating factors included the payment of restitution and the absence of any continuing pattern of misconduct).

{¶ 16} Accordingly, respondent is hereby indefinitely suspended from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON and O'DONNELL, JJ., concur.

O'CONNOR and LANZINGER, JJ., dissent and would permanently disbar respondent.

Michael M. Hughes and Michael M. Hughes Jr., for relator.

Vladimir M. Rus, pro se.